**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROSEANNA DI VINCENTI LE BOEUF, | |
| Plaintiff, | |
| -vs- | Case No.: 2:22-cv-02255-JP |
| | **JURY TRIAL DEMANDED** |
| TRANS UNION, LLC, | |
| Defendant. | |

## FIRST AMENDED COMPLAINT

Plaintiff Roseanna Di Vincenti Le Boeuf ("Plaintiff" or "Plaintiff Le Boeuf"), a living, breathing 66-year-old consumer, by and through her undersigned counsel, brings this Complaint against Defendant Trans Union, LLC ("Trans Union" or "Defendant") for actual, statutory, and punitive damages, costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of Trans Union's mixing of Plaintiff's deceased sister's personal and credit information into Plaintiff's credit file and thereafter falsely reporting to Plaintiff's creditors that she is deceased and has no credit score.

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making

1

by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the credit bureaus acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      The three major national CRAs are Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union").

5.      These CRAs sell credit information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.       Congress made the following findings when it enacted the FCRA in 1970:

1)   The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

2)   An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

3)   Consumer reporting agencies have assumed a vital role in assembling and evaluation consumer credit and other information on consumers.

4)   There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4). Thus, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities'". *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

8.       Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C.§1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

9.       One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

10.     The preservation of one's good name and reputation is also at the heart of the

FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all
> sorts of computerized data banks, the individual is in great danger of having his life
> and character reduced to impersonal "blips" and key-punch holes in a stolid and
> unthinking machine which can literally ruin his reputation without cause, and make
> him unemployable or uninsurable, as well as *deny him the opportunity to obtain a*
> *mortgage or buy a home. We are not nearly as much concerned over the possible*
> *mistaken turn-down of a consumer for a luxury item as we are over the possible*
> *destruction of his good name without his knowledge and without reason.* * * * *[A]s*
> *Shakespeare said, the loss of one's good name is beyond price and makes one poor*
> *indeed.*

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)]

(emphasis added).

11.     In light of these important findings and purposes, Congress specifically noted "a

need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and

respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

12.     "Mixed files" create a false description and representation of a consumer's credit

history.

13.     A "mixed file" occurs when personal and credit information belonging to Consumer

B appears in one or more of Consumer A's credit files.

14.     The Federal Trade Commission defined a mixed credit file as a file that "refers to

a Consumer Report in which some or all of the information pertains to Persons other than the

Person who is the subject of that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362

(N.D. Tex. 1991).

15.     Mixed files are not a new phenomenon. Trans Union has been on notice of the

existence of mixed files and the fact that its procedures for creating credit files, including its

matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

16.     More recently, Trans Union has been the subject of numerous state attorney general actions relating to its mixed file problem.

17.     For example, in 2015, the New York Attorney General filed charges and settled claims with the Trans Union and the other CRAs over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

18.     Notwithstanding Trans Union's notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, dates of birth, and addresses.

19.     Further, mixed files result in the disclosure and publication of consumers' most personal identifying and financial information absent the consumer's knowledge or consent, or both.

20.     Trans Union has been sued thousands of times wherein an allegation was made that it violated the FCRA. Moreover, Trans Union is sued, at a minimum, hundreds of times each year wherein an allegation is made that it has mixed a consumers' credit file with that of another person.

21.     Private FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

---

[1] https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited June 23, 2022; *see also* https://ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited June 23, 2022.

22.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case No. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000 in actual damages and $5 million in punitive damages. Despite the verdict, Trans Union continues to mix consumers' credit files with other consumers' credit files.

23.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000 in actual damages and $2.7 million in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Trans Union continues to mix consumers' credit files with other consumers' credit files.

24.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000 in actual damages and $18.4 million in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Millers' numerous disputes. Despite the verdict, Trans Union continues to mix consumers' credit files with other consumers' credit files.

25.     Most recently, a jury assessed a $60 million verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC,* No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion LLC*, 951 F.3d 1008 (9th Cir. 2020)

Despite the verdict, Trans Union continues to mix consumers' credit files with other consumers' credit files.

26.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

27.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

28.     Finally, the Federal Trade Commission has specifically warned consumer reporting agencies, including Trans Union, to review its procedures when a mixed file case occurs.

29.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

30.     Plaintiff's claims arise out of Trans Union's blatantly inaccurate credit reporting, wherein Trans Union mixed Plaintiff's credit file with personal and credit information belonging to her deceased sister and, consequently, falsely reported to Plaintiff's potential creditors that she is "deceased" and does not have a credit score.

31.     Accordingly, Plaintiff brings claims against Trans Union for 1) failing to follow reasonable procedures to assure the maximum possible accuracy of her credit file and credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and 2) failure to conduct a reasonable reinvestigation of Plaintiff's dispute and correct its inaccurate reporting within 30-days of receipt of Plaintiff's dispute, in violation of the FCRA, 15 U.S.C. § 1681i(a)(1)(A).

32.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Trans Union for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## THE PARTIES

33.     Plaintiff Roseanna Di Vincenti Le Boeuf ("Plaintiff Le Boeuf") is a natural person who resides in Thibodaux, Louisiana, and is a consumer as that term is defined in 15 U.S.C. § 1681a(c).

34.     Defendant Trans Union, LLC ("Trans Union" or "Defendant") is a limited liability company with a principal place of business located at 2 Baldwin Place, Chester, PA 19022. Trans Union is authorized to do business in the State of Pennsylvania, including in this District.

35.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f).

## JURISDICTION AND VENUE

36.     This Court has jurisdiction over Plaintiffs' claims pursuant to 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

37.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

38.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

39.     The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personal, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…." 15 U.S.C. § 1681(b).

40.     The FCRA further requires that when preparing consumer reports a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

### Trans Union's Processing of Credit Information

41.     Trans Union regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

42.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

43.     Trans Union collects information from thousands of furnishers.

44.     The process by which Trans Union receives, sorts, and stores information is largely electronic.

45.     Furnishers report credit information to Trans Union through the use of coded tapes that are transmitted to Trans Union on a monthly basis through software known as Metro 2.

46.     Trans Union takes the credit information reported by furnishers and creates consumer credit files.

47.     Trans Union maintains credit files on more than 200 million consumers.

48.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

**Trans Union's Mixed File Problem**

49.     Trans Union knows that different consumers can have similar names.

50.     Trans Union knows that different consumers can have similar Social Security numbers.

51.     Trans Union knows that different consumers with similar names can also have similar Social Security numbers.

52.     Trans Union knows that public records often do not contain identifying information such as Social Security numbers or dates of birth.

53.     Trans Union matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

54.     Trans Union accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules, better known as Subject Selection Rules.

55.     Sometimes Trans Union's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what is commonly known in the industry as a mixed or merged credit file.

56.     Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Trans Union, regarding its significant failures and deficiencies with respect to mixed files.

57.     Despite Trans Union's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Trans Union containing information belonging to another consumer.

58.     A mixed or merged credit file is the result of Trans Union inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

59.     There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms (the database rules) used by Trans Union to match personal identifying information and credit information, including public record information, to a particular consumer's credit file.

60.     The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Trans Union.

61.     A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Trans Union.

62.     These rules also determine which credit files are selected by the algorithm and merged to create a complete consumer report.

63.     Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

### Trans Union's Flawed Matching Procedures

64.     Trans Union sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores. One item of information that Trans Union includes on reports it sells is information about whether the consumer who is the subject of the report is deceased.

65.     One way Trans Union determines whether a given consumer is deceased is by cross-referencing the consumer's Social Security number with information maintained by the Social Security Administration in a document called the "Death Master File" which contains information about Social Security death benefit claims.

66.     However, Trans Union does not have reasonable procedures to assure that there is only one Social Security number associated with every consumer.

67.     Accordingly, Trans Union routinely mixes deceased consumers' Social Security numbers into the credit files and reports of living consumers, which results in Trans Union reporting to the living consumer's potential creditors that he or she is deceased and, consequently, has no credit score.

68.     Defendant does not employ any procedures *at all* to assure that a consumer it is reporting as "deceased" based on a purported Social Security number match to the Death Master File is, in fact, actually deceased before publishing a credit report for that consumer to a creditor indicating the same, for profit.

69.     Even in instances where other data on the face of the consumer's report indicates that he or she is not deceased, Trans Union does not employ any procedures to assure that a consumer it reports as "deceased" based on the Death Master File is, in fact, actually deceased before reporting the same to that consumer's potential creditors.

70.     Once Trans Union labels a consumer as deceased, Trans Union will not calculate and will not provide a credit score for that consumer.

71.     As a general rule, creditors will not lend to consumers for whom any the major CRAs will not provide a credit score, particularly when the creditor is informed the basis for Trans Union's refusal to issue a score is that the consumer is deceased.

72.     Trans Union's false deceased reporting therefore locks consumers out of the credit market entirely.

73.     Trans Union charges third parties a fee for reports stating that a consumer is deceased.

74.     Trans Union profits from the sale of reports about deceased consumers.

75.     Trans Union knows that deceased consumers do not apply for credit.

76.     Trans Union knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Trans Union to be a common and major source of identity theft.

77.     Trans Union knows that identity theft and credit fraud are serious and widespread problems in our society.

78.     Trans Union warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing a deceased consumer's credit information or report.

79.     Yet, Trans Union does not require an executorship paper, or any other documentation demonstrating a legitimate purpose for accessing the report of a deceased consumer when such access is requested by a paying customer. Trans Union imposes no additional requirements whatsoever on paying customers who request a purportedly deceased consumer's information.

80.     Instead, Trans Union sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

81.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Trans Union to sell their credit reports to a paying customer, absent a court order.

**Goldman Sachs Denies Plaintiff Le Boeuf's Credit Application in December 2020**

82.     In or about December 2020, Plaintiff Le Boeuf was in need of a new cellular telephone and began searching for new phone options, including an Apple iPhone.

14

83.     On or about December 18, 2020, Plaintiff Le Boeuf submitted a credit application with Goldman Sachs Bank ("Goldman Sachs") for an Apple Card with approximately $2,000.00 in credit. Plaintiff Le Boeuf planned on using the Apple Card to purchase a new iPhone.

84.     On December 18, 2020, Goldman Sachs ordered a copy of Plaintiff Le Boeuf's credit report from Trans Union.

85.     Trans Union refused to return a credit score for Plaintiff Le Boeuf. Specifically, Trans Union reported to Apple Card/Goldman Sachs that Plaintiff Le Boeuf was deceased and, consequently, Trans Union would not return credit score.

86.     Trans Union's reporting was grossly inaccurate: Plaintiff Le Boeuf is not deceased and should have a credit score.

87.     Shortly thereafter, sometime in mid-December 2020, Plaintiff Le Boeuf received a credit denial letter from Goldman Sachs.

88.     Plaintiff Le Boeuf takes great pride in her good name and excellent credit rating and works hard to ensure that her bills are paid-in-full and on time each month. She believes and understands that her credit record with her creditors is excellent, so Plaintiff Le Boeuf could not imagine how her credit application had been denied by Goldman Sachs.

89.     Thereafter, Plaintiff Le Boeuf telephoned Apple Card, spoke with a representative, and requested the basis for her credit application being denied. The Apple Card representative informed Plaintiff Le Boeuf that Apple Card/Goldman Sachs had denied her credit application because Trans Union had reported her as deceased and would not provide a credit score.

90.     While angry and confused about how such a mistake could happen, and also fearful of what it meant to her ultimate ability to secure financing or obtain credit in the future, Plaintiff

Le Boeuf genuinely believed that such an obvious error would have to be fairly easily corrected. She kept her fingers crossed that after providing whatever proof Apple Card needed to override this mistake so she could proceed with obtaining the credit she desired. However, Plaintiff Le Boeuf quickly discovered that correcting this obvious error would not be as easy as she had hoped, as Apple Card's representatives informed her that it could not move forward with her credit application given the information reported by Trans Union.

**Plaintiff Le Boeuf's First Dispute to Trans Union Regarding its Inaccurate Credit Reporting in December 2020**

91. In or about mid-December 2020, worried about Trans Union's inaccurate reporting and fearing that she was a victim of identity theft, Plaintiff Le Boeuf contacted Trans Union by phone and spoke with a representative, specifically disputing the inaccurate "deceased" notation associated with her Trans Union credit file and credit report.

92. Trans Union's representative accessed Plaintiff Le Boeuf's credit file and informed her that, according to Trans Union's system, there were two different Social Security numbers associated with her credit file.

93. Thereafter, Plaintiff Le Boeuf was transferred to another special department that informed her that Trans Union reported her as deceased because the primary Social Security number associated with her credit file belonged to a deceased person. The Social Security number Trans Union labeled as Plaintiff Le Boeuf's "primary" Social Security Number does not belong to Plaintiff Le Boeuf.

94. The Trans Union representative assured Plaintiff Le Boeuf that she would remove the Social Security number that did not belong to her from her credit file and instructed Plaintiff Le Boeuf to call back in a week.

95.     Plaintiff Le Boeuf called Trans Union back one week later to follow up on the status of her dispute but none of the representatives she spoke with were able to confirm whether her dispute had been processed and whether her credit file and report had been corrected.

**Trans Union's Failure to Respond to Plaintiff Le Boeuf's December 2020 Dispute**

96.     Trans Union did not respond in writing to Plaintiff Le Boeuf's December 2020 dispute.

97.     Trans Union did not indicate that Plaintiff Le Boeuf's dispute was found to be frivolous or irrelevant.

98.     Trans Union failed to conduct a reasonable reinvestigation of Plaintiff Le Boeuf's December 2020 dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

99.     Thereafter, Trans Union failed to correct Plaintiff Le Boeuf's mixed credit file and failed to remove the deceased notation associated with Plaintiff Le Boeuf's credit file and credit report, and continued to report her as deceased and without a credit score, both of which are inaccurate.

100.    Thereafter, Plaintiff Le Boeuf was deterred from seeking additional credit opportunities as a result of Trans Union's inaccurate credit reporting.

101.    Discovery will show that Trans Union mixed consumer Rosetta Di Vincenti Le Boeuf's personal and account information into Plaintiff Le Boeuf's credit file and credit reports despite the fact that numerous discrepancies exist between their personal identification information. The discrepancies that should have caused Trans Union to realize Plaintiff Le Boeuf is not the same person as Rosetta Di Vincenti Le Boeuf include the following:

a) Plaintiff's legal name is **Roseanna** Di Vincenti Le Boeuf and the personal and account information Trans Union mixed into Plaintiff Le Boeuf's credit file and reports belong to Plaintiff Le Boeuf's deceased sister, **Rosetta** Di Vincenti Le Boeuf;

b) Rosetta Di Vincenti Le Boeuf **passed away** on September 19, 2009, and Plaintiff Le Boeuf is **still alive**;

c) At the time of Rosetta Di Vincenti Le Boeuf's passing in 2009, she resided in **Lockport**, Louisiana, and at that time Plaintiff Le Boeuf resided in and still resides in **Thibodaux**, Louisiana; and

d) **Plaintiff Le Boeuf's Social Security number is different than her deceased sister Rosetta Di Vincenti Le Boeuf's Social Security number.**

102.    At least one of Plaintiff Le Boeuf's Trans Union credit files contains or has contained personal information (including Social Security numbers) and credit account information, which does not belong or pertain to her.

103.    Trans Union's automated algorithms caused Plaintiff Le Boeuf's credit file and credit reports to become mixed with personal and credit account information belonging to Plaintiff Le Boeuf's deceased sister, Rosetta Di Vincenti Le Boeuf, in spite of the differences between Plaintiff LeBouef and her deceased sister.

104.    Within the two (2) years immediately preceding the filing of this Class Action Complaint, Trans Union prepared and distributed one or more consumer reports, as that term is defined by 15 U.S.C. § 1681a(d), pertaining to Plaintiff Le Boeuf that contained misleading and inaccurate information which belongs to another consumer, including without limitation, personal

information and credit accounts, which actually belong to Plaintiff Le Boeuf's deceased sister, Rosetta Di Vincenti Le Boeuf.

105.    Trans Union failed to maintain and follow reasonable procedures to assure the maximum possible accuracy of the personal and credit account information contained within Plaintiff Le Boeuf's credit file.

106.    Trans Union knows that its matching algorithms are flawed and frequently result in mixed information and credit files belonging to two different consumers.

107.    Trans Union has been sued thousands of times by consumers and suffered judgments as a result of mixing consumer credit information and credit files.

108.    Trans Union failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff Le Boeuf's credit file and credit reports, in violation of 15 U.S.C. § 1681e(b).

109.    Trans Union's failure to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff Le Boeuf's credit file and credit reports was negligent and/or willful.

110.    As a result of Trans Union's conduct, action, and inaction, Plaintiff Le Boeuf suffered damage by loss of credit; credit denials, including the inability to obtain a credit card; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and significant emotional distress, including the mental and emotional pain, anguish, humiliation, stress, anxiety, and embarrassment of credit denials and having her deceased sister's Social Security number and other information mixed into her Trans Union credit file and credit reports.

111.    Plaintiff Le Boeuf's emotional distress was particularly significant given the fact that Rosetta Di Vincenti Le Boeuf was her only sibling and passed away at the young age of 54

from terminal cancer. Rosetta Di Vincenti Le Boeuf's sudden death was very hard on Plaintiff Le Boeuf and these gut-wrenching emotions resurfaced each and every time that Trans Union reported to Plaintiff Le Boeuf's creditors that she was deceased and has no credit score.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures
### (First Claim For Relief Against Defendant)

112.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit files and credit reports it published and maintains concerning Plaintiffs. Among other things, Defendant allowed one person to be associated with multiple Social Security numbers, did not cross-check data from the Social Security Administration with other data in the file about the consumer (i.e. credit activity vs. the date of death), and did not require any additional verification of the consumer allegedly being deceased in spite of the consumer applying for credit.

113.    As a result of Defendant's conduct, action, and inaction, Plaintiffs both suffered damage by loss of credit; credit denials, including the inability to obtain credit cards; loss of the ability to purchase and benefit from their good names and credit ratings; detriment to their credit ratings; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and significant emotional distress, including the mental and emotional pain, anguish, humiliation, stress, anxiety, and embarrassment of credit denials.

114.    Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

115.    Plaintiffs are entitled to recover attorney's fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim For Relief Against Defendant)**

116.    Defendant violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiffs' credit files and credit reports after it received notice of such inaccuracies; by failing to conduct a lawful reinvestigation of disputed personal information, accounts, and a deceased status in Plaintiffs' credit files and credit reports; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiffs' credit files and credit reports.

117.    As a result of Defendant's conduct, action, and inaction, Plaintiffs suffered damage by loss of credit; credit denials, including the inability to obtain credit cards; loss of the ability to purchase and benefit from their good name and credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and significant emotional distress, including the mental and emotional pain, anguish, humiliation, stress, anxiety, and embarrassment of credit denials.

118.    Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

119.    Plaintiffs are entitled to recover attorney's fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

a)      Determining that Defendant negligently and/or willfully violated the FCRA;

b)      Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)      Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d)      Granting further relief, in law or equity, as this Court may deem appropriate and just.

**DEMAND FOR JURY TRIAL**

120.    Plaintiff demands a trial by jury on all issues triable by a jury.

Dated: June 28, 2022

/s/Shanon J. Carson
Shanon J. Carson, Bar No. 85957
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
T. 215-875-4656
F. 215-875-4604
scarson@bm.net

Hans W. Lodge*
Joseph C. Hashmall*
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470
hlodge@bm.net
jhashmall@bm.net
*Admitted Pro Hac Vice

Counsel for Plaintiff